In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 25-1149

BRAD PASSWATER,

*Plaintiff-Appellant,*

*v.*

TRICIA PRETORIUS, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:21-cv-475 — **Matthew P. Brookman**, *Judge.*

_____

ARGUED NOVEMBER 5, 2025 — DECIDED JULY 23, 2026

_____

Before RIPPLE, KIRSCH, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Brad Passwater, who has been incarcerated at Plainfield Correctional Facility for several years, suffers from paranoid schizophrenia. After expressing suicidal thoughts, he was placed on constant suicide watch twenty-four hours a day, seven days a week.

At some point, while on suicide watch, Passwater suffered a psychotic episode, and the prison's psychiatrist, Dr. Daniel

Rippetoe, who worked remotely, ordered the on-site nurse to give Passwater an emergency dose of psychotropic medication. No one, however, followed up with Passwater to see if he was experiencing any adverse effects from the medication. Unfortunately, the medication exacerbated Passwater's psychosis, and he began harming himself, eventually gouging out his eyes and ripping out his testicles.

To prevent such incidents, Plainfield utilized trained inmates (called "suicide companions") to help prison officials monitor individuals on suicide watch, like Passwater. The suicide companions would typically stand outside of the suicidal prisoner's cell and observe the subject through a small window located towards the top of the cell door. Passwater's suicide companion, however, was sitting down during his shift and did not see Passwater harm himself.

Pursuant to 42 U.S.C. § 1983, Passwater sued Dr. Rippetoe, as well as the prison's Deputy Warden, Tricia Pretorius, for exhibiting deliberate indifference to his medical needs in violation of the Eighth Amendment. Specifically, Passwater claims that Dr. Rippetoe failed to provide any follow-up care following the emergency administration of psychotropic medication. As for Deputy Warden Pretorius, Passwater alleges that she was aware that Plainfield's suicide companions were not adequately monitoring suicidal prisoners but took no action. The district court granted summary judgment for the defendants, and Passwater appeals.

This case is unquestionably a tragic one. We have no doubt that Passwater required some medical care following the administration of the psychotropic medication. But the question before us is more limited: whether the record contains evidence from which a rational jury could find that these two de-

fendants violated Passwater's Eighth Amendment rights. Unable to discern an evidentiary basis from which a reasonable jury could find in Passwater's favor, we affirm.

## I. Background

Because Passwater challenges the district court's order granting summary judgment to the defendants, we recount the facts in the light most favorable to him. *See Sanders v. Moss*, 153 F.4th 557, 561 (7th Cir. 2025).

### A. April 16, 2026 Incident

Passwater was incarcerated at Plainfield Correctional Facility ("Plainfield"), part of the Indiana Department of Corrections ("IDOC"), during the events in question. He has a long history of mental illness, including a diagnosis of paranoid schizophrenia, of which Plainfield was aware.

At the prison, Passwater was being treated by Dr. Rippetoe, a psychiatrist whom Plainfield hired to provide medical care for its inmates. Dr. Rippetoe resided in Florida and had been providing psychiatric services to Plainfield inmates via telehealth appointments since 2019. Because of his remote services, Dr. Rippetoe relied on a mental health team at Plainfield that included an on-site psychologist and master's-level therapist. He also relied on nurses to administer medications to inmates and to monitor them afterwards.

In the months leading up to April 2020, Passwater saw Dr. Rippetoe to manage his medication, which primarily consisted of Haldol Decanoate injections. Although the injections were involuntary, Passwater believed Haldol Decanoate was effectively controlling his mental illness.

Sometime before April 12, 2020, Dr. Rippetoe decreased Passwater's Haldol dosage over time and added Risperdal. After the first decrease in Haldol, Passwater did not notice any significant change in his mental health. After the second time, however, Passwater began to feel delusional and paranoid, and he ended up in two fights, landing him in restricted housing. Eventually, Passwater expressed suicidal thoughts and tried to find a razor blade to harm himself because, in his mind, he was "starting Armageddon." For that, Passwater was placed on constant suicide watch where he remained for four days until the day of the incident at issue, April 16. During that time, his mental health worsened.

At 7:30 a.m. on April 16, Passwater had a scheduled telepsychiatry appointment with Dr. Rippetoe, but Passwater refused the appointment. In his Electronic Medical Record ("EMR") filed at 8:03 a.m., Dr. Rippetoe reported that Passwater "has become delusional and disorganized" since his Haldol dosage was reduced. Dkt. 119-18 at 21, 23.[1] There were "[n]o current safety issues," he wrote but observed that Passwater was "[p]aranoid," had a "[l]oose" thought process, and experienced "[s]evere" impairment in making reasonable decisions. *Id.* at 21–22. Around the same time, Passwater began throwing toilet water at correctional officers and staff as they walked by his cell because, he says, uncontrollable thoughts in his head were directing him to do so.

At 10:29 a.m., Nurse Sara Scott had a verbal telehealth conference with Dr. Rippetoe regarding Passwater's "psychotic

---

[1] "Dkt." refers to the docket number in the district court record.

episode." *Id.* at 25. Dr. Rippetoe directed her to give Passwater an emergency dose of Haldol Decanoate and Haldol Lactate.

Before Nurse Scott had a chance to administer the medications, a correctional officer went into Passwater's cell and pepper sprayed him to deter him from throwing toilet water on the staff. When this failed, Passwater was sprayed a second time.

After the guards took Passwater to the showers to wash off the pepper spray, Nurse Scott gave Passwater the emergency doses of Haldol Decanoate and Haldol Lactate. He was then returned to his cell, and the exterior door to his cell was closed. As a result, the only way anyone standing outside of the cell could see in was by looking through a small window located towards the top of the cell door. Once inside his cell, Passwater began to feel worse and felt a burning sensation along his back.

Although IDOC policy required Nurse Scott to assess Passwater after administering the medications, she did not do so. However, between 11:06 a.m. and 11:34 a.m., Passwater was visited by Mark Lincks, a mental health professional at Plainfield. In his EMR (filed at 12:55 p.m.), Lincks reported that Passwater had "just received" the emergency medication and that Passwater told Lincks he was still having suicidal thoughts. Dkt. 119-4 at 118. The report also indicated that Passwater was "continue[ing] to throw urine or water on staff and suicide companions." *Id.* Lincks ordered that the suicide watch continue.

Although remote, Dr. Rippetoe had access to Passwater's medical records, including Lincks's EMR. But, after ordering the emergency dose administration, Dr. Rippetoe did not con-

duct a post-medication assessment, nor did he follow up with Lincks, Nurse Scott, or anyone else for that matter.[2]

At noon, Antoine Fox, one of Plainfield's suicide companions, began a 4-hour shift monitoring Passwater. Video recordings indicate that, around 1:28 p.m., Passwater began to punch himself in the face. His actions drew no blood, but he began to "get[] very agitated." Dkt. 109-6 at 2. At 1:46 p.m., Passwater began poking and mutilating his eyes, but again he did not appear to be bleeding. Ten minutes later, Passwater can be seen beginning to "forcefully pull on his penis on and off" to the point where blood was plainly visible on his hands and crotch area. *Id.* At 2:04 p.m., he began to rip and tear at his scrotum and penis, drawing large amounts of blood visible on his arms, legs, and torso.

Throughout this time, Fox was seated in a chair outside of Passwater's cell, unable to see inside. Two different correctional officers instructed Fox to stand up at different times, but he did not listen. At 2:17 p.m., an officer looked into Passwater's cell, saw him covered in blood, and reported it to the sergeant "immediately." *Id.* A sergeant then "rushed" to Passwater's cell and "immediately" called for first responders. Dkt. 109-5 at 8.

---

[2] Dr. Rippetoe argues that he did provide post-medication care, citing to his testimony that he had calls with the nurses before and after Passwater's self-harming incident. But this is disputed; there is no record of such calls as IDOC procedures required. Dr. Rippetoe also could not recall the timing of these calls or whom they were with. Thus, for the purposes of summary judgment, we assume that Dr. Rippetoe did not provide any post-medication care.

Passwater was rushed to the hospital where he underwent several operations. He remains blind and without any testicles.

## B. The Suicide Companion Policy

Plainfield's supervision of suicidal inmates was governed by IDOC Policy 4.06A*, "Suicide and Self-Injury Prevention." In accordance with the policy, the facility provided two levels of "enhanced supervision" for such inmates—close observation and constant observation. Dkt. 109-1 at 2. The latter required "[c]ontinuous, 1:1 observation for an offender who has engaged in an act of self-injury or" who is at "imminent risk of self-injury." *Id.* "The offender shall be observed continuously without interruption" the policy continued, "with a clear, unobstructed view, until the Constant Observation Suicide Watch is discontinued." *Id.*

The policy also laid out the requirements for the training and utilization of "Suicide Watch Companions" who can "assist staff in the direct, constant, visual monitoring of an offender who has been placed on Constant Observation." *Id.* When an inmate agrees to serve as a suicide companion, he attests that he will, among other things, maintain constant and direct visual observation of the inmate on suicide watch and alert staff immediately if the inmate on suicide watch displays signs of self-injurious behavior.

Furthermore, under Policy 4.06A*, an individual could only serve as a suicide companion for four hours in a twenty-four-hour period. It was later decided that shifts be limited to two hours for suicide companions who assisted in a "constant suicide watch," because they needed to remain standing dur-

ing the entire shift in order to view the subject through the cell door window. Dkt. 119-8 at 15.

As the Deputy Warden of Plainfield in April 2020, Tricia Pretorius was aware of Policy 4.06A* and the requirements for suicide companions. In fact, she participated in regular Suicide Prevention Meetings with Plainfield's Suicide Prevention Committee, which included herself, various medical and mental health providers, custody staff, and chaplains. At these meetings, the committee discussed Plainfield's suicide prevention measures and addressed any problems with the implementation of the prison's suicide prevention policy.

On March 13, 2020, approximately a month before Passwater's incident, Leah Stevenson, a suicide companion coordinator at Plainfield, stated that she "was not aware of" the new two-hour policy. Dkt. 119-8 at 15. She added that she "went around yesterday to [mental health] staff and custody staff and [she] could not find anyone who could verify" the policy. *Id.* In response, Lincks sent the following email to Stevenson adding Deputy Warden Pretorius to the recipient list:

> [T]his appears to be something you need to verify and discuss with Ms. Pretorius and maybe Mr. Vanihel as they have both been involved in the discussions of the policy for 2 hr shifts for SW [Suicide Watch] companions that have to stand, so I'll copy them on this email thread. If you're concerned we don't have the staffing to do this then they need to be involved with this discussion.

*Id.* at 14.

**C. Procedural History**

In January 2024, Passwater filed an amended complaint, alleging that Dr. Rippetoe and Deputy Warden Pretorius violated his Eighth Amendment rights. As to the former, Passwater claimed that Dr. Rippetoe was deliberately indifferent to the significant risk of harm that might befall him following an emergency administration of psychotropic medication by failing to provide any post-administration care. As to the latter, he alleged that Deputy Warden Pretorius was aware that suicide watch companions were not adhering to the two-hour policy but failed to take any action to remedy it. Dr. Rippetoe and Deputy Warden Pretorius moved for summary judgment, and the district court granted summary judgment in their favor. Passwater appeals.

## II. Discussion

We review the district court's order granting summary judgment *de novo* after construing all factual disputes in Passwater's favor. *See Sanders*, 153 F.4th at 567. We begin with Passwater's Eighth Amendment claim against Dr. Rippetoe before turning to his claim against Deputy Warden Pretorius.

**A. Dr. Rippetoe**

Passwater contends that Dr. Rippetoe was deliberately indifferent to his medical needs by failing to provide any care following the emergency administration of psychotropic medication. Section 1983 confers a private right of action against government officials who, acting under color of state law, deprive a plaintiff of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quot-

ing 42 U.S.C. § 1983). And "[t]he Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

To violate a prisoner's Eighth Amendment rights in the delivery of medical care, prison officials must exhibit "deliberate indifference to an inmate's serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025). To prevail on such a claim, the plaintiff must prove "(1) that he had an objectively serious medical condition (2) to which prison officials were deliberately, that is subjectively, indifferent." *Id.* (citation modified). He must also prove that the defendant's "deliberate indifference actually *caused* his injury." *Hunter*, 73 F.4th at 565 (citing *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)).

As to what "deliberate indifference" means, "[p]rison officials are deliberately indifferent when they know of and disregard a substantial risk to the inmate's health." *Riley*, 126 F.4th at 1295. It "entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (citation modified); *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (citation omitted).

As a result, when the defendant is a medical professional, the plaintiff must show more than medical negligence to

prove deliberate indifference. *Riley*, 126 F.4th at 1295. The "chosen treatment plan must represent so significant a departure from accepted professional standards or practices that it calls into question whether the provider actually was exercising professional judgment." *Id.* (citation modified). Put another way, the medical professional's care must be "so inadequate that it demonstrated an absence of professional judgment" such that "no minimally competent professional would have so responded under those circumstances." *Peterson*, 986 F.3d at 752 (citation omitted).

The parties do not dispute that Passwater suffered from an objectively serious medical condition or that he was at serious risk of committing suicide. The question is whether a reasonable jury could find that Dr. Rippetoe acted with deliberate indifference when he failed to provide any follow-up care after the nurses gave Passwater an emergency dose of psychotropic medication.

We conclude that the record lacks evidence from which a reasonable jury could so find. Passwater points to Dr. Rippetoe's deposition testimony acknowledging that a post-medication assessment is "standard," "common," and "might even be" required by IDOC policy. Dkt. 119-2 at 13–14, 32–33. But "standard" and "common" are words of negligence not deliberate indifference, which requires that "no minimally competent professional would have so responded under those circumstances." *Peterson*, 986 F.3d at 752 (citation omitted).

This is not to say that the medical personnels at Plainfield acted satisfactorily. As Passwater notes, Plainfield policy required nurses to observe an inmate for two hours after administrating emergency psychotropic medication, record their

observations in an EMR, and send the EMR to the prescribing doctor.[3] There is no indication that the nurses did any of this, and when he did not receive such a report, Dr. Rippetoe should have reached out to them to check on Passwater.

That said, Passwater failed to present evidence that "no minimally competent" physician would have behaved as Dr. Rippetoe did. Passwater relies on his expert, Dr. Andrew Lampkins, who opines that the failure to comply with the monitoring policy "would be contrary to best practices regarding patient safety and monitoring following the administration of involuntary psychotropic medication." Dkt. 113-3 at 3. But, again, failure to follow "best practices" is not deliberate indifference. *See Riley*, 126 F.4th at 1295.

Passwater also points to Lincks's EMR to argue that Dr. Rippetoe knew (or should have known) that Passwater was having a negative reaction to the emergency medication and should have intervened. Lincks visited Passwater after he had received the medication and approximately two hours before he began to harm himself. In a 12:55 p.m. EMR, Lincks reported that Passwater had "just received" the emergency medication but was still suicidal and "continued to display psychomotor agitation and unintelligible speech." Dkt. 119-4 at 118. Because Dr. Rippetoe had access to Lincks's EMR, Passwater posits, the doctor knew that Passwater was experiencing adverse effects from the emergency medication or, al-

---

[3] The policy required nurses to take vital signs immediately following the administration of the medication and one hour later. They were also required to assess the inmate continuously at fifteen-minute intervals for the first two hours and report any adverse side effects to the prescribing psychiatrist.

ternatively, should have checked the EMRs to make sure nothing was wrong.

The problem is that there is no evidence that Dr. Rippetoe read Lincks's EMR or deliberately avoided it. Nor is there any evidence that it would have been obvious to any minimally competent physician in Dr. Rippetoe's situation that failing to read Lincks's EMR would have resulted in serious risk of harm to Passwater. For these reasons, summary judgment in favor of Dr. Rippetoe was appropriate.

## B. Deputy Warden Pretorius

Next, Passwater contends that Deputy Warden Pretorius violated the Eighth Amendment because she knew that correctional officers were not following the two-hour suicide companion policy but did nothing to correct it. As an official responsible for setting prison policy, Deputy Warden Pretorius can be held liable for a constitutional violation if she is aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety and does nothing. *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (citing *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998)).

As Passwater notes, there is evidence that Plainfield had a policy instituting a two-hour shift for suicide companions who assisted with the constant observation of suicidal inmates. For example, in his March 13, 2020, email to Stevenson, Lincks wrote:

> Leah, it was brought to my attention you're not aware of a policy regarding SW [suicide watch] companions. Administration decided a year or two ago that if an offender, who is on Constant SW, has to have their door shut, then the com-

panion has to stand at the door and stare thru the window his whole shift. We've tried stools, but none are high enough because that window is so high. So it was decided to cut back their shift from 4hrs to 2 hrs.

Dkt. 119-8 at 15.

Additionally, because IDOC Policy 4.06A* mandated that suicidal inmates like Passwater be monitored constantly, a reasonable jury could find that the two-hour policy was necessary for the safety of such inmates. And the record contains evidence from which a jury could find that there was a systematic lapse in the enforcement of the two-hour policy. In fact, in response to Lincks's email, Stevenson replied that she "was not aware of this" and that she "could not find anyone who could verify this." *Id.*

What is more, there is evidence that Deputy Warden Pretorius may have known that the two-hour policy was not being followed. After Lincks received Stevenson's response, he sent another email to her, this time including Pretorious as a recipient:

> Ms Stevenson, this appears to be something you need to verify and discuss with Ms. Pretorius and maybe Mr. Vanihel as they have both been involved in the discussions of the policy for 2 hr shifts for SW companions that have to stand, so I'll copy them on this email thread. If you're concerned we don't have the staffing to do this then they need to be involved with this discussion.

Dkt. 119-8 at 14. And there is no evidence that Deputy Warden Pretorius did anything in response.

In short, we agree with Passwater that there is evidence
from which a reasonable jury could find the existence of the
two-hour suicide companion policy, the significant role the
policy played in the prison's ability to monitor severely sui-
cidal inmates, systemic noncompliance with the policy, and
Deputy Warden Pretorius's failure to correct it. But, despite
this, Passwater's claim against her fails for lack of causation.

In addition to establishing that Deputy Warden Pretorius
was deliberately indifferent to a serious medical need, Pass-
water must prove that her "deliberate indifference actually
*caused* his injury." *Hunter*, 73 F.4th at 565 (citing *Roe*, 631 F.3d
at 864). "In assessing causation in § 1983 cases, we look to gen-
eral principles of causation from tort law." *Id.* at 567–68 (citing
*Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012)).
This includes proximate causation, which limits a defendant's
liability to only those harms she foreseeably risked by her
wrongful actions. *Id.* at 558 (citations omitted). Furthermore,
a "corollary" to proximate cause is the idea of "superseding
cause," which is when "the plaintiff's injury is caused not by
a risk created by the defendant but by an unforeseeable inter-
vening act" that "sever[s] the defendant's liability." *Id.* (cita-
tions omitted). Although causation is "typically a question
best left for the jury," "there are cases where proximate cau-
sation may be decided as a matter of law." *Id.* (citation omit-
ted). Such is the case here.

In this case, Fox's refusal to stand while serving as Pass-
water's suicide companion was an intervening act that im-
peded the correctional officers from preventing Passwater
from severely harming himself. Passwater, however, blames
the prison's purported noncompliance with the two-hour pol-
icy for suicide companions, arguing that, because Fox had

started his shift at noon, the policy would have relieved him of duty at 2:00 p.m., allowing a new suicide companion to look in on Passwater at that time. But, as the video recording shows, Passwater began punching himself around 1:28 p.m., and by 1:45 p.m., he started to poke and grab at himself. Finally, at 1:56 p.m., Passwater began pulling forcefully on his penis, bloodying his hands and crotch area.

As this undisputed evidence shows, had Fox been standing during his shift outside of Passwater's door—as he was repeatedly instructed to do—he would have been able to observe Passwater's actions and alert the authorities within two hours of commencing his shift. Fox's actions, thus, constituted a superseding cause of Passwater's injuries that severed any liability on the part of Deputy Warden Pretorius, and summary judgment in her favor was appropriate.

\*　　　\*　　　\*

For these reasons, the district court's grant of summary judgment is AFFIRMED.